**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**AMY ELLENSON,**

**Plaintiff,**

**v.** **Case No. 25-CV-234**

**SHORELINE CREDIT UNION,**

**Defendant.**

---

## DECISION AND ORDER

---

What are employees to do if their workloads exceed what they can accomplish in a forty-hour workweek, but their employer prohibits them from working overtime? Employees that adhere to the prohibition on overtime may face consequences for falling behind on their work. Employees who put in the time required to keep up with their workloads risk discipline for violating the prohibition on overtime.

Faced with this dilemma, employees may simply work without reporting their overtime to their employer. Indeed, some employers may refer to policies prohibiting overtime with a proverbial wink and a nod, refusing to pay overtime but nonetheless expecting employees to work as many hours as it takes to keep up with their jobs.

On the other hand, what is an employer to do when an employee, in contravention of the employer's strict policies requiring logging all time worked, works overtime without recording it? Must an employer scrutinize collateral evidence

for hints of work performed outside of regular working hours or else face liability for unpaid overtime wages?

The Fair Labor Standards Act (FLSA) does not require payment for work the employer neither knew nor had reason to know was being performed. However, when employers have actual or constructive knowledge of employees working overtime, regardless of whether the employee reports it or even if the employer strictly prohibits overtime, the employer must compensate the employee. At the heart of this action is the question of whether the plaintiff was an employee who, without knowledge of her employer, was ignoring the defendant's strict prohibition on overtime and working extra hours to keep up with her work. Or was she working overtime with the defendant's knowledge, but the defendant nonetheless refused to pay her for it?

**1. Background**

Amy Ellenson began working for Shoreline Credit Union as a mortgage loan officer on August 5, 2024. (ECF No. 51, ¶¶ 5, 12.) Throughout her employment with Shoreline, Andrea Schmitt, Shoreline's chief mortgage officer, directly supervised Ellenson. (ECF Nos. 51, ¶ 34; 63, ¶ 7.)

Ellenson tracked her working hours using Shoreline's timekeeping platform. (*See* ECF No. 51, ¶¶ 22, 36.) Every two weeks Ellenson approved and certified the accuracy of her timesheet. (ECF No. 51, ¶ 37.) Shoreline's employee handbook, which Ellenson read, had various policies that prohibited any false statement on a timesheet. (ECF Nos. 51, ¶ 24; 23, ¶¶ 26–27.) The handbook also prohibited work "off

the clock," stated that employees will be paid at time-and-a-half for all overtime, and required prior approval for all overtime. (ECF No. 23, ¶¶ 28–30.)

Ellenson regularly reported working outside of Shoreline's normal business hours of 9:00 a.m. to 5:00 p.m. (*See, e.g.*, ECF No. 51, ¶¶ 42–47, 49–54.) She was paid for all time that she reported. (ECF No. 51, ¶ 48.)

In October 2024, Ellenson told Schmitt her workload had grown too large for a 40-hour workweek. (ECF No. 51, ¶ 101.) Schmitt alleges that she told Ellenson that she had to manage her workload "within 40 hours and only 40 hours." *Id.* Ellenson contends that Schmitt told her "to only log the 40 hours" even if she, in fact, worked more than 40 hours. (ECF No. 63, ¶ 38.) Later that month, Ellenson asked to work after normal business hours to work on loan applications; Schmitt told her that she would need to be "punched in" to do so. (ECF No. 51, ¶¶ 55, 58.)

Schmitt reviewed timestamps in Shoreline's loan origination platform, compared those timestamps to Ellenson's timesheets, and determined that Ellenson was working beyond the hours she reported. (ECF No. 63, ¶ 49.) Schmitt emailed Shoreline's CEO noting seven instances in which Ellenson apparently worked beyond the time recorded in her timesheet. (ECF No. 63, ¶ 50.)

Shoreline issued Ellenson a Final Written Warning on November 20, 2024, in part because timestamps in the loan origination platform during the week of November 11, 2024, did not correspond with Ellenson's timesheet. (ECF Nos. 51, ¶ 78; 63, ¶¶ 55–60.) The Final Written Warning itemized these instances where

discrepancies were observed and informed Ellenson that any future breaches of company timekeeping policy would result in termination. (ECF No. 63, ¶¶ 56–60, 62.)

Although Shoreline asserts that it instructed Ellenson to update her timesheet to add the referenced off-the-clock work (ECF No. 51, ¶ 90), Ellenson never did so (ECF No. 51, ¶¶ 89, 105), and Shoreline did not pay her for that time (ECF No. 63, ¶ 65). Ellenson estimates that she worked nine undocumented hours in that period. (ECF No. 63, ¶ 44.)

Shoreline terminated Ellenson's employment on December 5, 2024. (ECF No. 51, ¶ 133.) Ellenson's termination notice offered her three weeks of severance pay if she returned company equipment to Shoreline. (ECF No. 63, ¶¶ 73–74; *see also* ECF No. 53-13.) It is undisputed that Ellenson returned the equipment. (ECF No. 63, ¶ 75.) Because Ellenson was still in her "introductory period," (*see* ECF No. 51, ¶¶ 127, 133), Shoreline's policies did not entitle her to any remuneration for unused vacation time (ECF No. 23, ¶ 141). Nonetheless, Shoreline offered Ellenson an exception. (*See* ECF No. 63, ¶ 78.) It contends that this offer was contingent on Ellenson's acceptance of Shoreline's final accounting of all sums she was owed, including the amount of unused sick leave she had accumulated. Ellenson refused to accept Shoreline's offer. (*See* ECF No. 63, ¶¶ 76–79.)

Ellenson filed suit in this court on February 18, 2025, alleging violations of the Fair Labor Standards Act (FLSA) and Wisconsin's Wage Payment and Collection Law (WWPCL) for unpaid overtime. (ECF No. 1, ¶¶ 39–58.) Ellenson alleges additional violations of the WWPCL for unpaid severance, unpaid vacation, and unpaid sick

leave. (ECF No. 1, ¶¶ 59–68.) Ellenson additionally seeks liquidated damages under both statutes. (ECF No. 1, ¶¶ 45, 57, 67.) She did not file a wage claim with Wisconsin's Department of Workforce Development. (ECF No. 51, ¶ 143.) Shoreline seeks summary judgment as to all claims, and that motion is ready for resolution. (ECF No. 21.) The court has jurisdiction under 28 U.S.C. §§ 1331 and 1367(a).

**2. Motion to Strike and Motion for Sanctions**

Courts retain the inherent authority to strike non-compliant submissions in support of a motion for summary judgment. Fed. R. Civ. P. 56(e)(4); *J.J. Keller & Assocs., Inc. v. Tradex Glob., Inc.*, No. 25-CV-1321, 2026 U.S. Dist. LEXIS 29075, at *24 (E.D. Wis. Feb. 12, 2026). Motions to strike are disfavored, as they often serve only to aggravate the opponent, waste judicial resources, and cause delay. *Lake Ford, Inc. v. Ford Motor Co.*, No. 24-CV-0747, 2026 U.S. Dist. LEXIS 49885, at *3 (E.D. Wis. Mar. 11, 2026) (citing *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007); *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)). "Instead of narrowing the issues and allowing for a more expeditious resolution of the motion for summary judgment, motions to strike generate another round of briefs that the court is required to read before it can reach the merits of the underlying dispute." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Graphic Packaging Int'l, Inc.*, No. 06-C-1188, 2007 U.S. Dist. LEXIS 56970, at *9 (E.D. Wis. Aug. 3, 2007).

In response to a motion for summary judgment, a non-moving party may submit "a statement, consisting of short numbered paragraphs, of any additional

facts that require the denial of summary judgment ...." Civ. L.R. 56(b)(2)(B)(ii). In response to Shoreline's motion, in addition to offering additional facts, Ellenson repeated certain of Shoreline's proposed facts.

Repeating an opponent's proposed findings of fact is inconsistent with Civ. L.R. 56(b)(2)(B)(ii), but resorting to a motion to strike merely compounds the inefficiency. *See* Civ. L.R. 56(b)(10) ("Collateral motions, such as motions to strike, are disfavored."); *see also* Gen. L.R. 1 ("Compliance with the rules is expected. However, the rules are intended to be enforced primarily upon the Court's own initiative, and the filing of motions alleging noncompliance with a rule may be reserved for egregious cases."); Gen. L.R. 83(f) ("The Court may impose appropriate sanctions on any party or attorney who fails to comply with a Local Rule. The Local Rules are intended to be enforced primarily upon the Court's own initiative. A party should not file a motion seeking sanctions for alleged noncompliance with a Local Rule unless the alleged violation is egregious or unfairly prejudicial.")

Belaboring this issue stands to compound what has already been a needless diversion. Ellenson's actions, while inconsistent with the court's local rules, were neither egregious nor unfairly prejudicial to Shoreline. Accordingly, Shoreline's motion to strike Ellenson's proposed findings of fact will be denied. Shoreline's motion for sanctions will be denied.

Ellenson's own motion to strike is also pending before this court. She seeks to strike both the declaration of Carsin Boeck and the supplemental declaration of Andrea Schmitt, or alternatively to file a sur-reply. Ellenson argues that she has been

prejudiced by the lack of opportunity to respond to Boeck's declaration and by the introduction of new evidence in Schmitt's declaration. However, the record does not support either contention. Ellenson received ample notice that Shoreline would rely on Boeck, and much of what is discussed in Boeck's declaration can be corroborated by other record sources.

As for Schmitt, any "new evidence" produced by this declaration is evidence that could have been discovered by Ellenson with greater diligence. The court has already heard Ellenson's request for the production of loan processing records (ECF No. 16), and its minute order on that matter expressly reserved her right to revisit the issue if necessary. (ECF No. 32). Until the instant motion to strike, Ellenson does not appear to have done so. Regardless, the court does not rely on any genuinely new matter contained in the reply declarations. Ellenson's motion to strike the declarations of Boeck and Schmitt will be denied. Moreover, the court will likewise deny Ellenson's request to file a sur-reply. *See, e.g.*, *Novoselsky v. Zvunca*, Case No. 17-cv-427, 2017 U.S. Dist. LEXIS 110096, 2017 WL 3025870 at *4 n.2 (E.D. Wis., July 17, 2017) (collecting cases) ("[S]ur-replies are never permitted as a matter of course (and are indeed disfavored) ….").

**3. Summary Judgment Standard**

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender Ltd. Liab. Co. v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). The court does not "weigh the evidence and determine the truth of the matter" but rather

"determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The movant has the burden to show that summary judgment is appropriate. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). The court will "read the facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 945 (7th Cir. 2024). Nonetheless, the non-movant must go beyond mere allegations and conclusions and instead support its contentions with proper documentary evidence. *Foster v. PNC Bank*, 52 F.4th 315, 320 (7th Cir. 2022); *Weaver*, 3 F.4th at 934. Speculation is insufficient to create a genuine dispute of material fact. *Id.* If the movant sustains its burden and shows both that there are no disputed material facts and that it is entitled to judgment as a matter of law "[t]he court shall grant summary judgment ...." Fed. R. Civ. P. 56(a).

## 4. Claim for Unpaid Overtime

### 4.1. Overtime Generally

The FLSA and the WWPCL require employers to pay non-exempt employees at one and one-half times their regular rate of compensation for work done in excess of forty hours per week. 29 U.S.C. § 207(a)(1); Wis. Admin. Code DWD § 274.03. This requirement extends to all work the employer knows about, regardless of whether the employee failed to report overtime hours or whether the employer asked for the work. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (quoting *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008)); *see also* Wis. Admin. Code

DWD § 272.12(2)(a)(1). The employer "cannot sit back and accept the benefits" of its employees' overtime work "without compensating for them." 29 C.F.R. § 785.13; Wis. Admin. Code DWD § 272.12(2)(a)(3). Employers who do not want overtime work performed must "exercise [their] control and see that the work is not performed." 29 C.F.R. § 785.13. "The mere promulgation of a rule against such work is not enough." *Id.* "Management has the power to enforce the rule and must make every effort to do so." *Id.*

However, an employer is not required to compensate an employee for work that it does not know about or has no reason to know about. *Kellar*, 664 F.3d at 177; *see also* 29 C.F.R. § 785.11; Wis. Admin. Code DWD § 272.12(2)(a)(1). An employer's knowledge of its employee's overtime work can be either actual or constructive. *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017) (citing *Kellar*, 664 F.3d at 177). To prevail on a claim for unpaid overtime, Ellenson must demonstrate that she worked overtime without compensation and that Shoreline had actual or constructive knowledge of this work. *See Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1220 (N.D. Ill 2017).

**4.2. Actual or Constructive Knowledge**

"An employer has constructive knowledge of its employee's work if it should have acquired knowledge of that work through reasonable diligence." *Allen*, 865 F.3d at 938 (citing *Hertz v. Woodbury Cnty.*, 566 F.3d 775, 781 (8th Cir. 2009)). Employers can exercise reasonable diligence by establishing a process by which employees can report uncompensated worktime. *Id.* Accordingly, the Seventh Circuit has affirmed

summary judgment where an employee's own noncompliance with their employer's reporting process prevents the employer from learning about the overtime work. *See Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 271 (7th Cir. 2014); *see also Allen*, 865 F.3d at 938–39. However, "an employer's formal policy or process for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting in practice," such as by taking overt action (*e.g.*, informing employees not to record overtime hours) or by instituting practices that "'squelch[] truthful responses'" on overtime reports. *See Allen*, 865 F.3d at 939 (quoting *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827–28 (5th Cir. 1973)).

Ellenson contends that Shoreline knew she was working off the clock because Schmitt explicitly instructed her to do so. This assertion is consistent with Ellenson's interrogatory response and with her declaration that she submitted in response to Shoreline's motion for summary judgment. Ellenson states in her declaration:

> Andrea Schmitt[] specifically told me that despite the volume of work that I had, I was required to complete it all within the 40-hour workweek. She told me that even if I was required to work more than 40 hours, I was only allowed to "log the 40 hours" and no more.

(ECF No. 52, ¶ 12.)

Shoreline argues that Ellenson's declaration is contradicted by her deposition testimony. Specifically, Ellenson testified:

> The only verbal discussions that we had regarding timekeeping was when I explained to her -- there was one incident where I explained to her that my pipeline had grown too large for a 40-hour workweek. She explained that I needed to manage my pipeline within 40 hours and only 40 hours. It did not matter how. I was only allowed to log 40 hours. Nothing had been stated about working -- or about not being allowed to work off the clock.

(ECF No. 53-1 at 82, 81:15–24.)

Shoreline argues that the court must disregard Ellenson's declaration under the "sham affidavit" rule. Then, given Ellenson's deposition testimony and Shoreline's strict policies against off-the-clock work, it is entitled to summary judgment.

Under the sham affidavit rule, a party cannot avoid summary judgment merely by submitting an affidavit (or declaration) that contradicts the person's prior sworn statement. *See United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 466 (7th Cir. 2005); *see also Beckel v. Wal-Mart Assocs.*, 301 F.3d 621, 623 (7th Cir. 2002); *Hickey v. Protective Life Corp.*, 988 F.3d 380, 389–90 (7th Cir. 2021) (quoting *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 293 (7th Cir. 1996)). Such a declaration is so lacking in credibility that the court may disregard it. *Beckel*, 301 F.3d at 623. The court, however, applies this rule with "great care" and only when the declaration inexplicably contradicts prior sworn testimony. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015).

While there is a degree of inconsistency between Ellenson's testimony and declaration, it is not the sort of inexplicable contradiction that makes resort to the sham affidavit rule appropriate. The deposition testimony leaves room for Schmitt having also told Ellenson to log only 40 hours even if she was required to work more.

If Schmitt instructed Ellenson to work off the clock, Shoreline is not entitled to summary judgment simply because Schmitt's instruction was contrary to Shoreline's express policies. *See, e.g.*, *Allen*, 865 F.3d at 939; *Brennan*, 482 F.2d at 827. Whether Schmitt actually gave such an instruction is a credibility question that

the court cannot resolve on summary judgment. *See Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.").

Regardless of the dispute over what Schmitt told Ellenson, the record permits a finding of actual knowledge as to at least some unpaid work. By November 20, 2024, Shoreline had compared Ellenson's timecards with its loan processing system and email records and identified specific work performed outside her recorded hours. After Shoreline discovered that work, Ellenson's prior failure to comply with its reporting procedures did not eliminate Shoreline's obligation to compensate her for that known work.

### 4.3. Damages

"If [an] employee can overcome summary judgment by showing there is a genuine dispute of material fact as to whether she worked uncompensated overtime," the court then considers whether the employee has demonstrated a genuine factual dispute regarding her damages. *See Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1257 (7th Cir. 2025) (citing Fed. R. Civ. P. 56(a)). When the alleged overtime hours went undocumented, the employee must present "sufficient evidence" of the hours worked "as a matter of just and reasonable inference." *Id.* at 1256 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). It is then the employer's burden "to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employee's

evidence." *Id.* (quoting *Brown v. Family Dollar Stores of Ind., LP*, 534 F.3d 593, 595 (7th Cir. 2008)).

Shoreline argues that the just and reasonable inference and its burden shifting framework should not apply because it was Ellenson's own actions, and disregard of Shoreline's strict policies, that created the uncertainty. Ellenson's claim, however, depends on the factfinder accepting that Schmitt told her to disregard Shoreline's timekeeping policies. In Ellenson's version, she was simply following her supervisor's instructions by not documenting all the hours she worked. Consequently, Ellenson is entitled to rely on the "just and reasonable inference" and need only produce "sufficient evidence" of the hours she worked.

Sufficient evidence requires more than Ellenson's general assertion that she regularly required more than 40 hours a week to complete her work. *See Osborn*, 126 F.4th at 1262–63 (citing *Holaway v. Stratasys*, 771 F.3d 1057, 1059 (8th Cir. 2014)) ("[A]n employee cannot overcome even the relaxed just and reasonable inference standard based on a bare assertion of working more than forty hours per week."). However, an employee is not required to "identify specific dates or times when she worked overtime, so long as she otherwise offers enough information about her routine to support a just and reasonable inference as to the extent of her uncompensated overtime." *Id.* at 1262 n.2.

Thus, Ellenson grounds her estimate in specific timestamped instances of off-the-clock work and estimates of how long the specified tasks would take. (*See* ECF Nos. 50, ¶¶ 23–27, 30, 55–61; 53-6; 53-11.) This sort of evidence and methodology

reasonably constitutes sufficient evidence that could support a finding in the plaintiff's favor. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (noting that inferring the amount of unreported overtime "from the particulars of the jobs the [plaintiff] did" can allow the trier of fact to draw a "'just and reasonable inference' concerning the amount of time the employee had worked"). Consequently, the court will deny Shoreline's motion for summary judgment with respect to Ellenson's claim for unpaid overtime. Whether Ellenson worked five to ten uncompensated hours every workweek from September through November as she alleges remains a matter for trial.

**5. Wages Under Wisconsin's Wage Payment and Collection Law**

To prevail on a wage claim under the WWPCL, an employee must establish that she has (1) performed personal services that entitle her to wages and (2) that "the employee's entitlement to the wages must be clear and already determined by either an agreement or employer's policy." *Sliwinski v. City of Milwaukee*, 2009 WI App 162, ¶ 17, 321 Wis. 2d 774, 777 N.W.2d 88. Thus, to withstand summary judgment on these claims, Ellenson must demonstrate that a genuine dispute of material fact exists with respect to whether she performed personal services that entitle her to sick pay, severance, and vacation pay and whether her entitlement to that remuneration was clear and determined either by agreement or Shoreline's policy.

### 5.1. Sick Pay

Ellenson does not dispute that Shoreline paid her sick pay on January 17, 2025, and therefore concedes that her WWPCL claim for unpaid sick pay is moot. (ECF No. 49 at 15.) Accordingly, the court will dismiss Ellenson's WWPCL claim for unpaid sick pay with prejudice.

### 5.2. Severance

An employer violates the WWPCL if it fails to promptly pay an employee's wages.

> "Wage" or "wages" mean remuneration payable to an employee for personal services, including salaries, commissions, holiday and vacation pay, overtime pay, severance pay or dismissal pay, supplemental unemployment benefit plan payments when required under a binding collective bargaining agreement, bonuses and any other similar advantages agreed upon between the employer and the employee or provided by the employer to the employees as an established policy.

Wis. Stat. § 109.01(3).

"Severance pay" is explicitly listed as a form of "wages" under the WWPCL. Wis. Stat. § 109.01(3). However, the term has assumed a broad colloquial understanding to encompass all forms of renumeration associated with the termination of employment. The court cannot presume that the payment equivalent to three-weeks pay that Shoreline referenced in its termination letter constituted wages simply because it used the term "severance pay."

Shoreline argues that the severance pay it referenced in Ellenson's termination letter was not "wages" under Wis. Stat. § 109.01(3) because it was not "remuneration payable to an employee for personal services". (ECF No. 22 at 22); Wis. Stat.

§ 109.01(3). It points to *State, Dep't of Indus., Labor & Human Relations v. Coatings, Inc.*, 126 Wis. 2d 338, 376 N.W.2d 834 (1985), in support. (ECF No. 22 at 22–23.)

*Coatings*, however, did not address severance pay. It held only that future compensation owed under a terminated employment contract is not wages under the WWPCL. *Coatings,* 126 Wis. 2d at 344–45, 376 N.W.2d at 837.

Whether severance pay constitutes wages depends on the nature and circumstances that gave rise to it. Employees, over the course of their employment, may accrue the right to severance pay pursuant to, for example, "a collective bargaining agreement, an employment contract or the employer's established policy." *See Sliwinski*, 2009 WI App 162, ¶20. In this retrospective circumstance, the severance pay may be seen as wages, and specifically as a form of deferred compensation, because "the entitlement to the remuneration is based on past personal services performed." *See id.*, ¶ 18; *cf. Stevenson v. Branch Banking & Tr. Corp.*, 159 Md. App. 620, 644, 861 A.2d 735, 749 (2004) (holding that severance pay was deferred compensation and thus wages under Maryland Wage Payment and Collection Law). Granted, severance pay will inherently have some relationship to an employee's past work; an employer is not going to offer severance pay to a person who was never an employee. That thin thread, however, is insufficient to make all severance pay "remuneration payable to an employee for personal services" so as to bring it within the scope of the WWPCL.

Thus, if the severance pay is offered simply in exchange for the employee's departure, a payment for such prospective action is less likely to be wages. But

sometimes even prospective severance pay may be offered in exchange for personal services and thus wages under the WWPCL. For example, severance pay offered in exchange for an employee's agreement not to compete against a former employer is wages. *See Raffaelli v. Advo, Inc.*, 218 F. Supp. 2d 1022, 1026 (E.D. Wis. 2002).

Shoreline has failed to prove that its offer of three weeks' pay as severance was a gratuitous settlement offer in exchange for Ellenson's departure. A reasonable finder of fact could conclude that the referenced severance pay was based on past personal services performed and thus wages under the WWPCL.

Alternatively, Shoreline acknowledges that it offered Ellenson three weeks of severance pay in exchange for her returning company property. (ECF No. 63, ¶ 73.) It is undisputed that she returned the property. (ECF No. 63, ¶ 74.) A reasonable finder of fact could conclude that such actions constituted personal services under the WWPCL. *Cf. Raffaelli*, 218 F. Supp. 2d at 1026 (holding that post-employment non-competition constituted personal services). Accordingly, the court must deny Shoreline's motion for summary judgment as to Ellenson's WWPCL claim regarding the unpaid severance pay.

### 5.3. Vacation Pay

Vacation time likewise may constitute wages under the WWPCL. Wis. Stat. § 109.01(3). The termination letter stated that Ellenson's final paycheck would include compensation for any accrued but unused vacation time. (ECF No. 53-13 at 1.) But the letter added that this was an exception to Shoreline's policies. (ECF No. 53-13 at 1.)

When employees departed during their probationary period, Shoreline's policy was to not compensate the employee for unused vacation. Shoreline's CEO, however, approved a policy exception for Ellenson. (ECF No. 53-12 (emails referring to approved policy exception).) Shoreline now argues that its CEO's statements were "mistaken" and did not constitute an "agreement" for purposes of Wis. Stat. § 109.01(3). (ECF No. 58 at 15–16.)

Again, wages are "remuneration payable to an employee for personal services … agreed upon between the employer and the employee or provided by the employer to the employees as an established policy." Wis. Stat. § 109.01(3). The last clause is inapplicable to the question of whether Ellenson's unused vacation time was wages. It is undisputed that, because she was terminated in her probationary period, Shoreline's policies barred Ellenson from receiving compensation for her unused vacation. Thus, Ellenson is entitled to compensation for her unused vacation time only if there was an agreement between her and Shoreline. (ECF No. 49 at 16 (Ellenson arguing, "Ellenson's entitlement to vacation pay and severance pay is based on agreement.").)

Ellenson offers scant argument with respect to how the unused vacation is "wages." Rather, she lumps her argument regarding vacation pay in with her argument regarding severance pay. (ECF No. 49 at 16-18.) However, her argument regarding severance pay rests on a different foundation. Shoreline explicitly offered her three-weeks severance pay in exchange for her returning Shoreline's property. (ECF No. 53-13 at 1 ("Shoreline will extend a 3-week severance pay to Ms. Ellenson

on the 12/20/2024 pay period, assuming the above items are returned to the Manitowoc branch no later 12/17/2024.”).)

It is unclear why Shoreline said it would pay Ellenson for her unused vacation time when it is undisputed she was not entitled to it. If it was simply a gratuitous payment to an employee who happened to not work out, the unpaid vacation time likely could not be characterized as wages. Not only was such a payment not “agreed upon between the employer and the employee” but it was not “remuneration payable to an employee for personal services.” It was a unilateral goodwill gesture.

On the other hand, if Shoreline offered to pay Ellenson for her unused vacation time in exchange for, for example, Ellenson returning Shoreline’s property or doing something else that could be characterized as “personal services,” it would seem to constitute wages under the WWPCL. Without clear evidence as to the nature and purpose of proposed payment and the nature of any agreement, the court cannot find as a matter of law that the payment for unused vacation time was not wages. Consequently, the court must deny Shoreline’s motion for summary judgment as to this claim.

**6. Liquidated Damages under the FLSA**

Employers who fail to pay unpaid overtime compensation are liable not only for the unpaid amount, but also “an additional equal amount as liquidated damages.” 29 U.S.C. § 216(b). However, if the employer proves that it acted “in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]” the court may award decline to award liquidated damages,

or award liquidated damages of a lesser amount than otherwise specified. 29 U.S.C. § 260.

Shoreline argues that its policies and training regarding accurate timekeeping, as well as the affirmative steps it took to uncover Ellenson's off-the-clock work, prove that it acted in good faith. (ECF No. 22 at 18–19.) However, a dispute of material fact exists over whether Schmitt told Ellenson to log only 40 hours even if she worked more. Such an instruction would be inconsistent with the narrow good faith exception to liquidated damages. Consequently, Shoreline has not shown that the undisputed evidence forecloses Ellenson's claim for liquidated damages under the FLSA.

Shoreline alternatively argues that the unclean hands doctrine prevents Ellenson from recovering liquidated damages. However, there is reason to doubt that the unclean hands defense applies to a claim for liquidated damages. *See Lopez v. Autoserve, L.L.C.*, No. 05 C 3554, 2005 U.S. Dist. LEXIS 29161, at *4 (N.D. Ill. Nov. 17, 2005); *see also, e.g.*, *Barba v. New Century Chinese Buffet, Inc.*, No. 2:20-cv-01557, 2023 U.S. Dist. LEXIS 175000, at *17–18 (W.D. Pa. Sep. 29, 2023); *De Gracas v. Running Billboard Corp.*, No. 06-60027-CIV-CONN/S, 2006 U.S. Dist. LEXIS 109573, at *11 (S.D. Fla. Apr. 11, 2006). The liquidated damages provision is not equitable in nature, *see McLaughlin v. Owens Plastering Co.*, 841 F.2d 299, 301 (9th Cir. 1988) (discussing liquidated damages vis-à-vis the right to a jury trial), and the unclean hands defense has traditionally been limited to claims for equitable relief, *see Henderson v. United States*, 575 U.S. 622, 625 n.1 (2015) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

If the doctrine applies, the dispute of material fact as to whether Schmitt instructed Ellenson to not record her time would make summary judgment inappropriate. Accordingly, the court must deny Shoreline's motion for summary judgment as to Ellenson's claim for liquidated damages under the FLSA.

**7. Increased Wages under the WWPCL**

Shoreline argues that Ellenson is not entitled to increased wages under the WWPCL because she failed to file a claim with the Wisconsin Department of Workforce Development (DWD) before filing the present action.

The WWPCL does not require employees to first file a claim with the DWD before bringing a civil action. Wis. Stat. § 109.03(5); *Levin v. Gass & Riegert Auto Complex, Inc.*, 2009 WI App 56, ¶ 1, 317 Wis. 2d 730, 768 N.W.2d 62, 2009 Wisc. App. LEXIS 207 (unpublished). Rather, the WWPCL merely encourages employees to use the DWD's administrative process by affording employees double the civil penalty if they wait to file a suit until after the DWD completes its process. *See* Wis. Stat. § 109.11(2); *Hubbard v. Messer*, 2003 WI 145, ¶27, 267 Wis. 2d 92, 673 N.W.2d 676.

If an employee files a civil action "before the department has completed its investigation," the employee is entitled to a civil penalty in the form of "increased wages of not more than 50 percent of the amount of wages due and unpaid." Wis. Stat. § 109.11(2)(a). If the employee files a civil action after the department completes its investigation and attempts to settle the claim, the employee may receive "increased wages of not more than 100 percent of the amount of those wages due and unpaid." Wis. Stat. § 109.11(2)(a).

Shoreline reads the statute as creating three categories. First, a plaintiff gets increased wages of 100 percent the unpaid wages if she files suit after the DWD completes its investigation. Second, a plaintiff who files a complaint with the DWD but does not wait for it to complete its investigation may get increased wages of only 50 percent. Third, a plaintiff who never filed a complaint with the DWD is not entitled to any increased wages.

Shoreline's argument is unsupported by the text of the statute. The statute, Wis. Stat. § 109.11(2), creates a binary division between before and after the DWD completes its investigation. It does not create or even suggest that there exists a third category for instances where the plaintiff files suit without filing a claim with the DWD. If an employee never files a complaint with the DWD, she will necessarily file suit before the DWD completes its investigation. Thus, she is entitled to increased wages of only 50 percent. *See Hubbard*, 2003 WI 145, ¶27 (acknowledging that employees have the option of "bypassing" the DWD and obtaining civil penalties under Wis. Stat. § 109.11(2)(a)). Accordingly, Shoreline's motion for summary judgment regarding Ellenson's claim for increased wages under the WWPCL will be denied.

## 8. Conclusion

For the reasons set forth above,

**IT IS THEREFORE ORDERED** that Shoreline's motion for summary judgment (ECF No. 21) is **granted in part and denied in part**. It is granted with respect to Ellenson's claim regarding unpaid sick pay and denied in all other respects.

**IT IS FURTHER ORDERED** that Shoreline's motion to strike Ellenson's proposed finding of fact (ECF No. 64) is **denied**.

**IT IS FURTHER ORDERED** that Ellenson's motion to strike or in the alternative to file a sur-reply (ECF No. 68) is **denied**.

**IT IS FURTHER ORDERED** that the Clerk shall schedule a telephonic conference to discuss further proceedings.

Dated at Green Bay, Wisconsin this 30th day of September, 2026.

*s/ Byron B. Conway*
BYRON B. CONWAY
U.S. District Judge